AMERICAN XYROFIN, INC., *et al.*, Plaintiffs-Appellants, v. ALLIS-CHALMERS CORPORATION, Defendant-Appellee and Separate Appellee (A-C Compressor Corporation, Defendant-Appellee and Separate Appellant).

Second District   No. 2—91—0875

Opinion filed June 24, 1992.

James T. Ferrini, Susan Condon, Ronald O. Armbrust, and Kevin J. Young, all of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, for appellants.

Roberta L. Holzwarth, of Holmstrom & Kennedy, of Rockford, and Francis W. Deisinger, John R. Stoffer, and Katherine McConahay Nealon, all of Reinhart, Boerner, Van Deuren & Norris, of Milwaukee, Wisconsin, for appellee A-C Compressor Corporation.

Robert J. Noe, of Bozeman, Neighbour, Patton & Noe, of Moline, for appellee Allis-Chalmers Corporation.

JUSTICE DOYLE delivered the opinion of the court:

Plaintiffs, American Xyrofin, Inc., and Finn-Cal Sweetener Company, appeal the trial court's order granting summary judgment in favor of defendants, Allis-Chalmers (Chalmers) and A-C Compressor Corporation (A-C), on the issue of recovery in tort for economic

losses. A-C separately appeals the trial court's order in favor of Chalmers on their cross-motions for summary judgment on the issue of successor liability under the terms of an asset purchase agreement.

The issues presented for review are: (1) whether the harm resulting from the failure of a centrifugal compressor, including damage to the compressor itself and lost profits, is wholly compensable in tort; and (2) whether the trial court erred when it interpreted the asset purchase agreement between Chalmers and A-C so as to fully allocate the responsibility for a meritorious claim by plaintiffs to A-C.

Plaintiffs leased from Hoffman La-Roche (plaintiffs' parent company) a commercial building and centrifugal compressor unit located in Thomson, Illinois. The centrifugal compressor was manufactured by the compressor division of Chalmers and was utilized in conjunction with plaintiffs' grain processing operations. Prior to the initiation of this lawsuit, Chalmers, in February 1985, sold its compressor division to A-C.

Dan Odren, a former field service technician and design engineer for Chalmers, testified at his evidence deposition that in June 1981 Chalmers advised plaintiffs about design problems with its D48 compressor which could lead to a premature compressor blade failure. Chalmers advised plaintiffs of the potential for increased vibration levels and recommended that the compressor unit be shut down in order to effectuate an immediate change out of the affected rotor components. Odren further stated that he and other Chalmers officials met with officials from Hoffman La-Roche to discuss the vibration problems. At their meeting, the Hoffman La-Roche officials became very upset about a possible plant shutdown because of compressor problems. Because of high production demands, plaintiffs chose not to remove the unit from service, opting instead for a change-out date sometime in the fall of 1981. Plaintiffs also requested additional advice from Chalmers on how to continue operation of the unit in such a manner as to minimize the risk of failure. Chalmers provided technical advice consisting of suggested operating procedures and vibration monitor settings.

In October 1981, plaintiffs advised Chalmers that they wished to further delay the change out of the affected compressor components until spring 1982. On or about November 1, 1981, plaintiffs advised Chalmers that the vibration level in the compressor unit had increased. On November 27, 1981, the compressor unit "went down" because of a rotor blade failure, damaging the compressor unit itself and the surrounding structure that housed the compressor unit. As a

result of the failure, plaintiffs were also forced to close their plant while repairs to the unit were effectuated.

Four and one-half years after the compressor failure, on May 30, 1986, plaintiffs filed their complaint against Chalmers and A-C for damages in the amount of $1,061,489.95. Plaintiffs alleged that defendants negligently instructed them as to the continued safe operation of a centrifugal compressor that was in a defective condition and, as a result, the compressor failed resulting in severe damage to the compressor unit and the surrounding premises and lost business, past and future. Defendants moved to strike the portion of plaintiffs' complaint which sought to recover for economic losses. The trial court granted defendants' motion and struck the portion of plaintiffs' complaint which sought recovery of repair costs for the compressor unit and damages for lost business, past and future.

In its memorandum opinion dated June 3, 1987, the trial court was puzzled by the failure of plaintiffs to allege the source of defendants' duty to render nonnegligent advice. The court expressed its uncertainty as to whether the duty arose from the sale of the product or whether it arose from a service agreement between the parties. The trial court stated that in order for plaintiffs to avoid the application of the doctrine of *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, they would have to characterize the defendants as being in the business of supplying information. Plaintiffs, the court stated, failed to allege the existence of a legal duty based upon the defendants acting as suppliers of information, and, additionally, the court opined that this characterization would most likely not apply to plaintiffs. The court continued that, under the allegations of the complaint, "[p]laintiffs can recover, if at all, damage to the [p]laintiffs' premises alone if they properly allege a sudden and violent occurrence. Even with an allegation of [a] sudden and violent occurrence, damage to the compressor itself and losses to the [p]laintiff arising out of repairs and lost business, past and future, would be considered economic losses under *Anderson [Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146] and *East River Steamship [Corp. v. Transamerica Delaval, Inc.* (1986), 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295]."

On July 10, 1987, plaintiffs filed an amended complaint which was withdrawn and refiled on April 10, 1989. Plaintiffs alleged, as a result of defendants' negligent advice as to the continued operation and use of the compressor, a sudden and calamitous failure causing severe damage to the unit itself, damage to the surrounding premises, and losses arising from repairs and lost business. On May 22, 1989, the

trial court again struck the portion of plaintiffs' amended complaint seeking recovery for damages to the unit itself and lost business.

On May 26, 1989, Chalmers filed its answer to plaintiffs' amended complaint and a "third-party complaint" against codefendant A-C alleging that the asset purchase agreement entered into between Chalmers and A-C allocated the responsibility for any third-party claims to A-C. A-C denied the allegations.

On June 19, 1989, plaintiffs filed their second amended complaint. The allegations were substantially the same as in the previous complaint, with the exception that plaintiffs amended their allegations to read that defendants possessed particular expertise and knowledge and that they undertook to advise plaintiffs as to the safe operation of the compressor without damaging the compressor or surrounding property. In addition, defendants failed to properly and fully inform them of the potential harm by continued use and how to safely operate the compressor in light of increased vibration levels when defendants knew or should have known of the dangers caused by excessive vibrations. Plaintiffs further alleged that as a result of defendants' instruction and advice there was a sudden and calamitous failure of the compressor causing damage to the unit itself, surrounding property and losses arising out of repairs and lost business.

Approximately one year later, in order to posture the case for review, the parties entered into a settlement agreement in the amount of $9,000 for the surrounding property damage. The trial court dismissed plaintiffs' claim for damage to surrounding property without prejudice to plaintiffs' right to argue the existence of recoverable damages for the compressor and lost profits. Subsequent to that order and after the dismissal of their third amended complaint on technical grounds, plaintiffs filed their fourth amended complaint, which was similar in substance to their second amended complaint with the exception that the claim for damages to the surrounding property was deleted.

The fourth amended complaint alleged, in part:

"8. As a direct and proximate result of the aforesaid acts and omissions of ALLIS-CHALMERS in instructing and advising the Plaintiffs regarding the operation and use of the aforesaid Centrifugal Compressor, the compressor failed in a sudden and calamitous manner on November 27, 1981, causing damage to property other than the compressor. As part of this failure, a vane, or piece, of the rotating impeller encased in the compressor, broke loose and shot through the steel casing of the compressor and damaged equipment adjacent to the compres-

sor including a fan and part of the building in which the compressor was housed. This failure occurred without warning to Plaintiffs and despite the fact that the Plaintiffs had at all times operated the compressor according to the parameters set by ALLIS-CHALMERS. As a result of these damages, Plaintiffs were forced to shut down operations.

9. As a further direct and proximate result of the aforesaid acts and omissions of ALLIS-CHALMERS and the resulting sudden and calamitous failure of the compressor, the Plaintiffs suffered damages to the compressor itself and component parts as well as lost profits, past and future."

Chalmers and A-C filed a joint motion for summary judgment against the plaintiffs and separate cross-motions for summary judgment on the issue of successor liability under the asset purchase agreement. The trial court granted defendants' joint motion for summary judgment and, in addition, granted the cross-motion in favor of Chalmers.

We first consider the action of the trial court in granting defendants' joint motion for summary judgment. Although the trial court granted the motion without comment, we must assume from the motion itself, the procedural history of the litigation, and the appellate arguments of the parties that the court determined that, as a matter of law, the type of damages alleged (*i.e.*, repairs to the compressor and resulting business losses) are economic in nature and not compensable in tort.

This interpretation would be consistent with the comments of the trial court in its June 3, 1987, memorandum opinion granting defendants' motion to strike, wherein it was stated:

"Under the allegations in the Complaint it is the opinion of this Court that the Plaintiffs can recover, if at all, damage to Plaintiffs' premises alone if they can properly allege a sudden and violent occurrence. Even with an allegation of sudden and violent occurrence, damage to the compressor itself and losses to the Plaintiff arising out of repairs and lost business, past and future, would be considered economic losses under *Anderson* and *East River Steamship*."

Although plaintiffs advance a theory of negligent advice, there has been no argument that recovery of economic damages might be permitted because defendants were engaged in the business of providing the advice which is alleged as the negligent conduct. Instead, in responding to defendants' joint motion for summary judgment, plaintiffs allege a duty to provide nonnegligent advice based upon sections 311 and 323 of the Restatement (Restatement (Second) of Torts §§311,

323 (1965)). Although the existence of a legally cognizable duty is not raised as an appellate issue, it is important to note that any question of the liability of an entity engaged in the business of providing advice is beyond the scope of this appeal.

Plaintiffs contend that recovery in tort for damages to the compressor unit itself and lost profits is permissible on two separate grounds: (1) that the existence of damage to the surrounding property brings them within what they perceive as an "other property exception" of *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, thereby precluding that case's application; and (2) that the failure of the compressor was a sudden and calamitous occurrence, thus allowing for recovery in tort. Defendants respond that plaintiffs are merely seeking redress for the disappointed commercial expectations incident to the compressor's failure and that the essential nature of their claim is for economic losses which are not recoverable in tort.

■ The rule in Illinois is that recovery for solely economic losses in relation to a product may not be had upon a tort theory of negligence. (*Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 439-40; *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 85.) The underlying rationale that has been articulated is that a manufacturer should not be held liable for downstream losses caused by a product failing to meet a subsequent purchaser's specific business expectations. (*Moorman,* 91 Ill. 2d at 88.) A manufacturer, in effect, would be exposed to potential liability of unknown and unlimited scope even though there was no damage to persons or property. *Moorman,* 91 Ill. 2d at 88.

■ " 'Economic loss' has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property ***.' " (*Moorman,* 91 Ill. 2d at 82, quoting Note, Economic Loss in Products Liability Jurisprudence, 66 Colum. L. Rev. 917, 918 (1966).) The determination of economic loss does not, however, turn upon a mechanical application of the definition; rather, it lies in the policy differences between the law of torts and contracts. (*Moorman,* 91 Ill. 2d at 96 (Simon, J., specially concurring).) The policy underpinning of tort law is to protect persons and property from unreasonable risks of harm, whereas harm that relates to a purchaser's disappointed expectations that a product is of a particular quality so that it is fit for ordinary use is addressed by contract principles. (*Moorman,* 91 Ill. 2d at 88.) The key determination, therefore, is whether the type of loss suffered is best resolved by the risk/responsibility allocations of contract/warranty law, or whether the

defendants owed a duty to protect persons and property from harm thus invoking the safety/insurance policies of tort law. *Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 157 (Simon, J., specially concurring).

■ To recover in tort, there must be a showing of harm above and beyond disappointed commercial expectations. (*A, C & S*, 131 Ill. 2d at 441.) The demarcation between tort recovery for physical harm and economic loss depends on: (1) the nature of the defect; and (2) the manner in which the harm occurred. (*A, C & S*, 131 Ill. 2d at 441, citing *Moorman*, 91 Ill. 2d at 82.) Although tort damage is typically the result of an accident involving some violence or collision with external objects (*A, C & S*, 131 Ill. 2d at 441), the existence of actual injury to other property does not in itself necessarily establish whether the damage to the defective product itself or to other property constitutes economic harm. The mere existence of physical harm to other property should not make a claim compensable in tort where the resultant harm flows only from disappointed commercial expectations. *Moorman*, 91 Ill. 2d at 95 (Simon, J., specially concurring).

■ Although we agree with plaintiffs' assertion that damage to other property is a significant factor in determining whether to invoke the safety policy of tort law, we are unable, based upon our reading of *Moorman* and subsequent case law, to discern a discrete exception based solely upon the existence of damage to surrounding property. Therefore, absent additional factual circumstances sufficient to implicate legitimate safety/insurance concerns, the sole existence of damage to other property, in and of itself, is insufficient to allow recovery in tort.

■ Plaintiffs' second contention is that damages resulting from a sudden and calamitous occurrence are recoverable in tort. It is noted that the trial court quoted a portion of *Anderson* which in turn quoted portions of the Supreme Court opinion in *East River Steamship* as follows:

> "[W]hen the damage sustained results from a qualitative defect of the product and no person is injured or other property damaged, 'the resulting loss is purely economic' [citation] whether the damage was caused by gradual deterioration, internal breakage, or calamitous event. Any loss sustained 'due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain— traditionally the core concern of contract law.'" (*Anderson*, 115 Ill. 2d at 151.)

Relying upon *Anderson* and *East River*, the trial court reasoned that it would be an improper interpretation of *Moorman* principles to allow recovery for physical harm to the product itself and lost profits even though the harm was caused by a violent event which also resulted in other property damage.

It is significant to note, however, that the facts presented in *East River* did not involve personal injury or damage to other property. Plaintiffs in that case sought recovery for repairs and lost income on the basis that defendants, as part of the manufacturing process, negligently supervised the installation of certain valves which resulted in the failure of steam turbine engines. (*East River*, 476 U.S. at 861, 90 L. Ed. 2d at 871, 106 S. Ct. at 2297.) The Supreme Court held that recovery for purely economic losses that result from the product *injuring only itself* are not compensable in tort. (*East River*, 476 U.S. at 871, 90 L. Ed. 2d at 877, 106 S. Ct. at 2302.) The Court further observed that the denial of recovery on a negligence theory was further supported by the fact that the only harm was to the product itself and not to persons or other property. (*East River*, 476 U.S. at 875, 90 L. Ed. 2d at 880, 106 S. Ct. at 2304.) In the present case, the parties concede in their briefs, and make evident by their settlement agreement, that damage to other property occurred. Thus, although not solely dispositive of the question of whether to allow recovery in tort, the existence of other property damage in the present case takes it outside of the holding in *East River*.

■ Damages which are the proximate result of a sudden and calamitous occurrence that causes harm to other property are compensable in tort. (*Vaughn v. General Motors Corp.* (1984), 102 Ill. 2d 431, 436; *Seegers Grain Co. v. United States Steel Corp.* (1991), 218 Ill. App. 3d 357, 366-67; *Bi-Petro Refining Co. v. Hartness Painting, Inc.* (1983), 120 Ill. App. 3d 556, 560.) The type of harm attendant to a sudden and calamitous event does not flow from disappointed commercial expectations; rather, it arises from "[h]azards peripheral to the product's [intended] function." (*Moorman*, 91 Ill. 2d at 97 (Simon, J., specially concurring).) When characterizing an event as sudden and calamitous the focus is upon "the suddenness of the *occurrence of an event*—the point when the injury occurs *** —where such occurrence causes personal injury or damage to property external to the defective product which exposes a party to an unreasonable risk of injury to himself or his property, rather than the suddenness or length of time within which the *defect or cause of the occurrence* develops *** and manifests itself in the sudden and calamitous occurrence." (Emphasis in original.) (*United Air Lines, Inc. v. C E I Industries of Illi-*

*nois, Inc.* (1986), 148 Ill. App. 3d 332, 339.) Additionally, a history of repairs prior to the occurrence does not necessarily detract from its characterization as sudden and calamitous where there is evidence to support the finding that the product failed in a sudden and calamitous manner. (*Vaughn*, 102 Ill. 2d at 436-37 (failure of brakes on truck sudden and calamitous even though plaintiff was aware of condition of brakes for 19 months prior to accident); *Seegers Grain*, 218 Ill. App. 3d at 366-67 (implosion of grain storage tank sudden and calamitous even though repairs to foundation and access doors of grain storage tank were performed three months prior to occurrence); *United Air Lines*, 148 Ill. App. 3d at 340-341 (roof collapse was sudden and calamitous even though plaintiff was aware of water accumulation resulting from roof leaks).) In the present case, therefore, the alleged history of the compressor's vibration or other warning signals would not preclude a finding of a sudden and calamitous event.

■ Defendants argue, however, that the *"de minimis* value" of the surrounding property damage as compared to the harm to the product itself and the claim for lost profits should not allow plaintiffs to transform their claim for economic losses into a tort claim. As stated above, it is the nature of the defect and the manner in which the harm creates an unreasonable risk to persons and property that is determinative. Moreover, the authority relied upon by defendants does not address differential values of harm as a basis upon which to allow or deny recovery in tort. See, *e.g., United Air Lines*, 148 Ill. App. 3d at 341.

It would be untenable to conclude, as a matter of law, that the damage to the surrounding structure allegedly resulting from a blade bursting through the housing of the centrifugal compressor, which claim was settled for $9,000, would be too insignificant to be a factor in the determination of whether to invoke the safety policy of tort law.

We are unable to find support for the defendants' contention that even if a sudden and calamitous occurrence resulting in damage to surrounding property were shown to exist, recovery for damages to the compressor and lost profits would nevertheless be unrecoverable in tort. The court in *Moorman* quoted Dean Prosser as follows:

> " 'There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also *property damage to the defective chattel itself*, as where an automobile is wrecked by reason of its own bad brakes ***.' Prosser, Torts sec. 101, at 665 (4th ed. 1971)." (Emphasis added.) (*Moorman*, 91 Ill. 2d at 86.)

It is our opinion that if plaintiffs can succeed in proving the existence of a sudden and calamitous occurrence causing damage to surrounding property, recovery should include damages for any harm which proximately resulted from defendants' breach of their duty including damage to the compressor and lost profits. See *Vaughn v. General Motors* (1984), 102 Ill. 2d 431; *Seegers Grain Co. v. United States Steel Corp.* (1991), 218 Ill. App. 3d 357; *Bi-Petro Refining Co. v. Hartness Painting, Inc.* (1983), 120 Ill. App. 3d 556.

■ Although the parties provide conflicting characterizations of the compressor's failure in their appellate arguments, the trial court was not required to reach the issue of whether a question of material fact existed as to the precise nature of the failure because it decided as a matter of law that, even if a sudden and calamitous occurrence were proved, the *Moorman* doctrine would still preclude recovery in tort for harm to the product itself and lost profits. In any event, we note that the trial court was not provided with a sufficient evidentiary basis to render any determination on the question of whether the failure of the centrifugal compressor was or was not a sudden and calamitous occurrence.

We hold that the trial court erred in granting defendants' joint motion for summary judgment.

### APPEAL ON DEFENDANTS' CROSS-MOTIONS

Defendants both agree that the sole issue in this cross-appeal is the interpretation of the successor liability provision contained within the asset purchase agreement. Paragraph 9(a) provides:

"9. *Assumption of Liabilities and Obligations*

(a) *Generally.* Except as otherwise provided herein, Buyer hereby assumes and agrees to pay, perform or discharge all liabilities and obligations resulting from the operations of CD on, before or after the date hereof. For a period of two years from the date hereof [6/24/85], Seller agrees to remain responsible for, and to indemnify Buyer from and hold Buyer harmless against, the amount of all liabilities and obligations resulting from the operations of CD on or before the date hereof that are not reflected on the Closing Balance Sheet; provided, that Buyer hereby assumes and agrees to pay, perform or discharge any and all liability as to claims made after the date hereof relating to property damage, including damage to the product itself, or personal injury or death caused in whole or in part by a product manufactured or sold by CD or its predecessors ('Product Liability Claims'). With respect to Product Liability claims

made on or prior to the date hereof, Seller shall remain liable for such claims.''

A-C contends that the trial court erred in granting summary judgment in favor of Chalmers because the language of the asset purchase agreement holds A-C liable only for "product liability" claims and not for claims arising from Chalmers' operations. A-C argues that because plaintiffs' claim is for negligent advice and not products liability, any loss which might result from a successful plaintiffs' action should be fully allocated to Chalmers. A-C acknowledges that the condition of the compressor was, in part, the cause of the damage; yet, it argues that this alone does not transform the claim into one for products liability. Chalmers responds that regardless of plaintiffs' theory A-C cannot escape the fact that the damage was caused by a failure of the product and that the indemnification provision holds A-C liable for any claims relating to the product. In its written memorandum opinion, dated June 10, 1991, the trial court stated that it was clear from an examination of plaintiffs' complaint that they were seeking damages for the compressor itself, its component parts and for lost profits and that liability for the cause of action passed to A-C by virtue of the asset purchase agreement.

■ Where no factual dispute exists, the interpretation of a contract is a question of law properly decided on a motion for summary judgment. (*Shorr Paper Products, Inc. v. Aurora Elevator, Inc.* (1990), 198 Ill. App. 3d 9, 12.) As a question of law, this court may interpret the agreement independent of the trial court's judgment. (*Shorr*, 198 Ill. App. 3d at 12-13.) Furthermore, it is presumed that the contract's terms and provisions were purposefully inserted and that the language employed therein was not idly employed. *Szczerbaniuk v. Memorial Hospital* (1989), 180 Ill. App. 3d 706, 713.

■ Upon our reading of the asset purchase agreement, we conclude that paragraph 9(a) allocated the responsibility for any liabilities resulting from a successful claim by plaintiffs to A-C. The language preceding the parenthetical phrase "Products Liability Claims" clearly defined what the parties intended the phrase to mean. It is commonplace in contracts for parties to define a duty or scope of obligation in detail and then to shorthand that definition by use of a descriptive term or phrase. The sentence succeeding the parenthetical is indicative of the parties' intent to do precisely that. Although the general rule of contractual construction is that terms are to be accorded their ordinary and obvious meaning (*Szczerbaniuk*, 180 Ill. App. 3d at 713), the parties are always free, through the use of express contractual

language, to expand or limit the meaning of commonly understood terms.

The parties here clearly defined the scope of A-C's obligations by defining products liability claims as *claims* made after the date of the agreement *"relating* to property damage, including damage to the product itself." In their fourth amended complaint, plaintiffs alleged that the defendants' negligent advice was the direct and proximate cause of the compressor failure which resulted in property damage to the unit itself, surrounding property and lost profits. It is apparent that plaintiffs' claim pertained to, and was connected with, the failure of the centrifugal compressor. We conclude, therefore, that paragraph 9(a) of the asset purchase agreement allocated the responsibility for any loss resulting from a successful claim by plaintiffs to A-C.

For the foregoing reasons, we affirm the trial court's order granting summary judgment in favor of Chalmers on the issue of successor liability under the terms of the asset purchase agreement, but reverse the order granting defendants' joint motion for summary judgment and remand this cause to the circuit court of Carroll County.

Affirmed in part; reversed in part and remanded.

BOWMAN and GEIGER, JJ., concur.